IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CITY OF AUSTIN, § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| v. § | | 1:17-CV-806-RP |
| § | | |
| STATE OF TEXAS and GREG ABBOTT, § | | |
| in his official capacity as TEXAS GOVERNOR, § | | |
| § | | |
| Defendants. § | | |

## ORDER

Before the Court is the motion of Plaintiff, the City of Austin ("City"), for a preliminary injunction, (Dkt. 4). Plaintiff seeks an order from this Court enjoining Defendants, Governor Greg Abbott and the State of Texas, from implementing SB 1004,[1] a bill passed by the Texas Legislature scheduled to take effect on September 1, 2017.

## BACKGROUND

Earlier this year, the governor signed SB 1004, a new law that imposes certain standards on the permitting process for telecommunications companies seeking to install pieces of equipment called "small cell nodes." These small cell nodes are of interest to providers of cellular service because they provide the capacity to reliably serve large crowds, and because they will form the basis for the development of a new kind of wireless network—5G. (*See* Resp. to Mot. Prelim. Inj., Dkt. 9, at 3). Up until now, municipalities have enjoyed the authority to impose fees on applications to install and use small cell nodes and rule on the applications when they see fit (within certain parameters established by the Federal Communications Commission). The City of Austin, for instance, has been charging an application fee of $1,250 per small cell permit application and an

---

[1] S.B. 1004, 85th Leg., Reg. Sess. (Tex. 2017).

annual rental fee of $1,500 per year for use of traffic signal poles downtown. (Mot. Prelim. Inj., Dkt. 4, at ¶ 9). Once SB 1004 goes into effect, however, such fees will be capped, and municipalities will be forced to act within a shorter time frame on applications for small cell node permits. In particular, SB 1004 places two temporal restrictions on the application process: a prohibition of "moratoria," or periods where a municipality refuses to issue permits, and the imposition of a "shot clock," or a specified time period within which an application must be reviewed. (*See* Mot. Prelim. Inj., Dkt. 4, at ¶¶ 54, 56). To prevent the implementation of SB 1004, scheduled to take effect on September 1, 2017, the City moved for a preliminary injunction. A hearing was held on August 30, 2017.

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy. This remedy is to be granted only if a plaintiff demonstrates (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion for all four requirements. *PCI Transp. Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## DISCUSSION

In the City's opening brief, it put forth two legal bases for enjoining the new law: (1) federal preemption; and (2) that the law effects an unconstitutional taking of private property without just compensation. Because the City did not respond in its Reply brief to Defendants' arguments concerning its takings claim or argue the matter at the hearing, its takings argument is deemed waived with respect to its motion for a preliminary injunction. Therefore, the Court will consider only the City's federal preemption claim, and determine whether this claim entitles the City to the injunction it seeks.

**I. Standing, Sovereign immunity**

As a preliminary matter, the Court addresses Defendants' jurisdictional arguments. Defendants argue that (1) the City lacks standing to bring this suit; (2) the State is immune from suit as a result of sovereign immunity; and (3) Governor Abbott is not a proper defendant. None of these arguments prevents the Court from hearing this case.

**A. Standing**

Article III standing requires (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable decision will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Here, Defendants dispute causation and redressability. However, the City has pleaded facts sufficient to demonstrate that the law's implementation will cause the City to lose revenue, and that an injunction preventing the law from taking effect would redress that injury. (*See* Mot. Prelim. Inj., at ¶¶ 9, 16).

**B. Sovereign Immunity**

Defendants are correct to point out that "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000). Congress may abrogate state sovereign immunity under certain circumstances, but it is not argued here that Congress has done so. Rather, the City relies upon *Ex parte Young*, 209 U.S. 123 (1908), which permits a suit for injunctive relief against a state official charged with enforcing a state law. *See Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014). Defendants contend that the governor is not a proper official to be named in this lawsuit, and that this case should therefore be dismissed, because neither the State nor the governor can be sued. The City does not dispute Defendants' assertion that the State has sovereign immunity here and cannot be sued under these circumstances. But as *Ex parte Young* shows, the fact that sovereign immunity bars a suit against the state does not automatically prevent the City from suing the governor in his official capacity.

3

Defendants, citing *Morris*, argue that the governor is not a proper party because he does not have the requisite connection with enforcement of the law in question. However, in *Morris*, where the governor was found to be an improper defendant, the district court's solution, approved by the Fifth Circuit, was to substitute the executive director of the Texas Department of Criminal Justice as the proper defendant. *Morris*, 739 F.3d at 745. If the State is correct that the governor is not the proper defendant in this case, then the remedy is not to dismiss the case entirely, but to substitute the person who is a proper defendant. A likely candidate here is the attorney general. When asked at the hearing who the proper defendant might be, counsel for Defendants was reluctant to answer. Counsel intimated that no one in state government has the responsibility of enforcing SB 1004, and that the only enforcement mechanism for the law is for private companies to sue municipalities that disobey its mandates.

The Court will at this time decline to substitute a new defendant, because further briefing is required on the issue of who the proper defendant may be. But the Court will not dismiss the case for lack of a proper defendant. Neither case that Defendants point to compels dismissal here. As discussed above, the remedy in *Morris* was to substitute the proper defendant in the place of the Governor. In the other case, *Okpalobi*, the statute at issue was a tort law, granting only a private cause of action. *See Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (ordering dismissal of an action brought against the governor and attorney general of Louisiana alleging the unconstitutionality of a state tort law). However, Defendants pointed to no private cause of action in SB 1004, nor is the Court aware of one. Further briefing regarding the existence of a state enforcement mechanism is needed, but concerns raised by Defendants underscore the Court's reluctance to find a likelihood of success on the merits.

**II. Express Preemption and the Preliminary Injunction Standard**

The City made no argument about three of the four elements of the preliminary injunction standard in its briefs.[2] Rather, it relied upon the case *Texas Midstream Gas Services, LLC v. City of Grand Prairie* for the proposition that a finding of likelihood of success on an express preemption claim is a shortcut through the normal preliminary injunction steps: "[i]f a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining requirements." 608 F.3d 200, 206 (5th Cir. 2010). On this theory, the City in its briefing only argued the likelihood-of-success prong, and let that speak for the remaining three prongs. It put all of its preliminary injunction eggs, so to speak, in one basket. Defendants dispute this characterization of *Texas Midstream Gas Services*. Tracing the reasoning of that case back to its origin in a 1990 Fifth Circuit case, Defendants say that the reasoning only applies if the remaining three factors were supplied by Congress, as they were with the Federal Aviation Act and subsequent federal aviation legislation. *See Trans World Airlines v. Mattox*, 897 F.2d 773 (5th Cir. 1990) (finding that "[u]nder the facts of this case" the other factors were met because of, among other reasons, "the finding of Congress that exclusive federal regulation in matters relating to airline rates, routes or services is in the public interest"). Where the remaining three preliminary injunction requirements are not supplied by findings of Congress, Defendants argue, they must be supplied by arguments from the party seeking the preliminary injunction. Because the Court finds that the City is not sufficiently likely to succeed on the merits to satisfy the preliminary injunction standard, it need not resolve the dispute concerning the necessity of demonstrating the remaining preliminary injunction factors when express preemption is at issue.

**III. Likelihood of Success on the Merits**

The City argues that SB 1004 is preempted by two provisions of the Telecommunications Act—47 U.S.C. §§ 253 and 332. *See also City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) (upholding

---

[2] It did attach several exhibits, entered into evidence at the hearing, which the city argued at the hearing constituted sufficient evidence to satisfy the remaining three preliminary injunction requirements.

FCC regulation interpreting § 332(c)(7)(B)(ii)'s requirement that wireless siting applications be reviewed "within a reasonable period of time").[3]

Preemption stems from the Supremacy Clause of the United States Constitution. *See* U.S. CONST. art. VI, cl. 2 ("[T]he Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."). If a state law conflicts with a federal law, the state law is invalid. *See Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015). When a federal law contains an express preemption clause, a court deciding a preemption claim must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

### A. 47 U.S.C. § 253(c)

The City claims that, as a local government, it is guaranteed "fair and reasonable compensation" by the Telecommunications Act. 47 U.S.C. § 253(c). According to the City, SB 1004 violates the fair and reasonable compensation to which the City is entitled by imposing unreasonably low caps on the City's application and use fees for providers seeking small cell nodes. (*See* Mot. Prelim. Inj., Dkt. 4, at ¶ 27 (claiming that caps on small cell permit application fees, above-ground use fees, and underground use fees violate this "federal mandate.")). Section 253(c) of the Telecommunications Act reads in full:

> State and local government authority. Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c). On its face, the text does not reach as far as the City would like. It makes clear that the protection of state and local authority in this arena only shields that authority from federal

---
[3] In its Reply brief and at the hearing, the City also referred to a Notice of Proposed Rulemaking and a request for comment by the FCC.

6

encroachment. All of the state and local government authority to which it refers is limited by the first clause: "Nothing in this section affects . . . ." *Id.* This part of the statute does not *grant* any power to state or local governments; it merely makes clear that the Federal Telecommunications Act will not interfere with existing state and local authority to set fair and reasonable compensation. Nothing in the text of the provision suggests, nor can it be plausibly inferred to suggest, that it will protect the right of local governments to set their own rates when a state government mandates otherwise. The City would like to have its own protected sphere of authority to set fair and reasonable compensation, free of state interference, but it cannot seek refuge in § 253(c).

Additionally, as Defendants point out, the provision expressly contemplates both state and local authority. The provision does not grant local authority a protection from state authority. Indeed, as the Supreme Court found in *Nixon v. Missouri Municipal League*, a case about Section 253, in order for a statute to be interpreted as "interposing federal authority between a state and its municipal subdivisions," the language must do so in a manner that is "unmistakably clear." 541 U.S. 125, 140 (2004). Here, it is clear that Congress has not interposed itself between state and local governments.

The City also relies on § 253(c) to say that SB 1004 prevents the City from receiving compensation "on a competitively neutral and nondiscriminatory basis." Because this is simply another clause in the same section as the phrase "fair and reasonable compensation," subject to the same limitation as stated above, this argument fails, as well.

### B. 47 U.S.C. § 332 and FCC

The City's argument based on § 332 does not pass muster, either. Section 332(c)(7)(B) is a preemption clause. It lists specific limitations on the authority of state and local governments to regulate the communications sector in various ways. Section 332(c)(7)(B)(ii), in particular, provides that federal law *does* preempt state and local authority with respect to the timing to act on a request

7

for authorization to site "personal wireless service facilities." 47 U.S.C. § 332(c)(7)(B)(ii) ("A State or local government *shall* act [on applications for wireless service siting] within a reasonable period of time . . . .") (emphasis added). This subsection imposes a directive requiring that state and local governments process such applications without unreasonable delay.

In 2009 the FCC, responding to complaints from cellular service providers that state and local governments were taking too long to process siting applications, issued an order interpreting "reasonable period of time" as set out in § 332(c)(7)(B)(ii). *City of Arlington*, 133 S. Ct. at 1867. In its order, the FCC interpreted "reasonable period of time" to mean presumptively within 90 days for collocation applications[4] and 150 days for all other applications; the Supreme Court upheld the interpretation as a legitimate exercise of the authority delegated by Congress to the FCC. *Id.*

The City contends that, in light of the FCC's order, it is not up to the state to determine what amount of time is "reasonable" and that SB 1004's "shot clocks" and "moratoria" are impermissible attempts to define "reasonable period of time" in a manner that differs from the FCC's authoritative interpretation. The City argues that the state, by imposing a shorter time period on local governments for application review than the one dictated by the FCC, has acted in a manner that conflicts with federal law.

However, the FCC order in question expressly allows for state and local governments to require completion of application review in a shorter time frame:

> To the extent existing State statutes or local ordinances set different review periods than we do here, we clarify that our interpretation of Section 332(c)(7) is independent of these statutes or ordinances. Thus, where the review period in a State statute or local ordinance is shorter than the 90-day or 150-day review period, the applicant may pursue remedies granted under the State or local regulation . . . .

*In re Petition for Declaratory Ruling*, 24 FCC Rcd. 13994, ¶ 50. The FCC makes clear that this provision and its regulation interpreting the provision operate independently of—and may happily coexist

---

[4] A collocation application is an application to place a new antenna or, in this case, small cell node, on an existing piece of infrastructure. *City of Arlington*, 133 S. Ct. at 1867.

with—any applicable state regulations requiring a shorter time frame. The order cannot be a reason to strike down a state regulation to which it gives its blessing.

Because the City has not shown a likelihood of success on either of its preemption arguments, it has failed to meet its burden and is not entitled to a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the City's motion for a preliminary injunction is **DENIED**. The parties are **ORDERED** to confer and file a joint proposed scheduling order on or before September 29, 2017.

**SIGNED** on August 31, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE